Filed 12/18/25  Wickline v. Schweder CA4/1
**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA


| | |
|---|---|
| DAVID WICKLINE,<br><br>    Plaintiff and Appellant,<br><br>    v.<br><br>INGO SCHWEDER,<br><br>    Defendant and Respondent. | D084858<br><br><br>(Super. Ct. No. RIC1708891) |


APPEAL from a judgment of the Superior Court of Riverside County, Randall S. Stamen, Judge.  Reversed in part and remanded.

Complex Appellate Litigation Group, Rex S. Heinke and Jessica M. Weisel; Holland & Knight, David A. Robinson and Anne Redcross Beehler for Plaintiff and Appellant.

Greines, Martin, Stein & Richland, Robin Meadow, Jeffrey Gurrola and Kylie L. Reynolds; Liner Freedman Taitelman + Cooley, Ellyn S. Garofalo and Amir Kaltgrad  for Defendant and Respondent.


This matter is before us for a second time.  In 2023, we vacated the trial court's judgment on the declaratory relief cause of action brought by

David Wickline against Ingo Schweder and other parties (collectively Defendants), and we remanded to the trial court "to hold further proceedings consistent with our opinion." (*Wickline v. Schweder* (Sept. 21, 2023, D080074) [nonpub. opn.] (*Wickline I*).)

A central issue in *Wickline I* was whether the trial court erred in ruling in a May 4, 2021 statement of decision (later incorporated into the July 9, 2021 judgment), that the partnership between Wickline and Schweder "terminated" on June 16, 2016. We observed that the trial court was "fatally unclear" as to what it meant by its statement that the partnership "terminated" on that date. We concluded, however, that the trial court erred if it meant to use the word "terminated" to indicate either (1) a termination of the partnership under the Revised Uniform Partnership Act (Corp. Code, § 16100 et seq.) (RUPA), which governs here; or (2) a termination due to Wickline's claim for damages in this lawsuit. We vacated the entirety of the declaratory judgment to allow the trial court to hold further proceedings on the declaratory relief cause of action in light of our opinion. In an attempt to prevent any fatal lack of clarity in a future declaratory judgment, we explained that "[i]f the trial court chooses to reissue a declaratory judgment stating that the partnership has terminated, the trial court must, at a minimum explain what it means by termination."

On remand, Wickline filed a peremptory challenge under Code of Civil Procedure section 170.6 against the Honorable Randall Stamen, who had presided over the trial and issued the judgment. Wickline contended he was entitled to exercise a peremptory challenge because the trial court would be holding further proceedings on the declaratory relief cause of action, amounting to "a new trial" under Code of Civil Procedure section 170.6,

2

subdivision (a)(2). Defendants objected to the challenge, and Judge Stamen issued an order striking it.

Wickline filed a petition for writ of mandate that challenged Judge Stamen's order striking the peremptory challenge. In ruling on the petition, we concluded that the peremptory challenge was premature because Judge Stamen had not yet indicated whether he "intends to simply clarify [the] prior declaratory judgment or to reexamine it after concluding [he] previously erred." We explained that only in the latter circumstance would Wickline be "notified that the trial judge 'is assigned to conduct a new trial on the matter.'"

Next, apparently choosing the approach of "simply clarify[ing]" the prior declaratory judgment, Judge Stamen issued a "Clarification of Prior Ruling" explaining why the May 4, 2021 statement of decision "fixed the date of termination as June 16, 2016." Judge Stamen explained that "the June 16, 2016 date was the date that Wickline permanently and of his own volition withdrew himself from the partnership by 'withholding his skills and not performing all of his duties to the partnership, thereby breaching his fiduciary duty.'" Importantly, however, Judge Stamen indicated that because Wickline could successfully seek reassignment to a different judge in the event of any "substantive change" to the declaratory judgment, the "Clarification of Prior Ruling" was meant to "do no more than clarify [the] prior ruling" and was not intended "to change the [May 4, 2021] [s]tatement of [d]ecision into a ruling that may survive on appeal."

Judge Stamen then entered a "reissued" judgment on the declaratory relief cause of action. That document stated that the 2021 judgment on the declaratory relief cause of action was "reissued" "as clarified by the [attached] 'Clarification of Prior Ruling.'"

3

Wickline appeals from the judgment. He contends that the reissued judgment on the declaratory relief cause of action still provides no legally sound basis to conclude that the partnership between Wickline and Schweder terminated on June 16, 2016. Emphasizing Judge Stamen's disclaimer of any attempt "to change the [May 4, 2021] [s]tatement of [d]ecision into a ruling that may survive on appeal," Wickline argues that the judgment, as clarified, "suffers from the same problems as the original [j]udgment and [s]tatement of [d]ecision -- it invests a means of 'terminating' a partnership that RUPA does not recognize." In this appeal, Wickline requests that we "set aside the Clarification [of Prior Ruling] and reissued [j]udgment, so a new judge can decide the status of the Partnership and Wickline's corresponding rights and interests as a partner."[1]

For the reasons explained below, we vacate the portion of the reissued judgment that states "[t]he Partnership between [Wickline] and [Schweder] terminated on June 16, 2016," and we remand to the trial court with directions to determine (1) the current status of the partnership and (2) Wickline's rights and responsibilities arising from the partnership.

---

[1] A new trial court judge will be handling any proceedings on remand from this appeal because, after reissuing the judgment, Judge Stamen granted a renewed peremptory challenge filed by Wickline after the parties filed memoranda of costs.

4

# I.

## FACTUAL AND PROCEDURAL BACKGROUND

In *Wickline I, supra*, D080074, we set forth a detailed description of the relevant factual and procedural background, portions of which we quote from here.[2]

"Wickline and Schweder agreed in 2014 to start working together to try to purchase and own wellness resorts. . . . The efforts of Wickline and Schweder culminated in the successful purchase of the Glen Ivy Hot Springs resort [(the resort)] in January 2016." (*Wickline I, supra*, D080074.)

"As required by the lender, the purchase transaction was structured through several layers of corporate ownership. The resort being purchased was owned by a California corporation, Glen Ivy Hot Springs, Inc. As the trial court described, '[the lender] required that 100% of the shares of the existing owners of Glen Ivy Hot Springs, Inc., be transferred into a single purpose entity formed to own the shares, GOCO Hospitality California, [Inc.,] a California corporation. GOCO Hospitality Global Opportunity Limited, a British Virgin Islands company [(GOCO BVI)], was to own 100% of the shares of GOCO Hospitality California, [Inc.]' GOCO BVI was a preexisting inactive 'shelf company' that, at the time, was 100 percent owned by Schweder as the sole shareholder. As the trial court explained, GOCO BVI was 'utilized for

---

[2] Wickline filed requests for judicial notice on December 9, 2024, and July 17, 2025, which are unopposed. The documents at issue consist of the parties' briefs for the previous appeal, and an order and filings in writ proceedings that Wickline instituted in this court. We hereby grant both requests. (Evid. Code, § 452, subd. (d) [authorizing judicial notice of the "[r]ecords of . . . any court of this state"].)

the purchase for tax purposes and other reasons.' " (*Wickline I, supra*, D080074.)

"The evidence at trial included documented discussion about the parties' agreement that Wickline would become a 42.5 percent shareholder of GOCO BVI. For example, the trial court found that in a December 2015 string of e-mails Wickline and Schweder 'confirmed that after the sale of the Resort: 42.5 percent of the shares of [GOCO BVI] would be transferred to [Wickline], 42.5 percent of the shares would be transferred to [Schweder;] and, the remaining shares reserved for later transfer to the company's key representatives and managers.' However, it is undisputed that Wickline never became a shareholder of GOCO BVI." (*Wickline I, supra*, D080074.)

"Shortly after the purchase of the resort, the ownership of GOCO BVI was reorganized so that Schweder owned 94 percent, [Schweder's wife] Josephine Leung owned three percent, and [director of finance, Matthew Brennan] owned three percent.[3] (*Wickline I, supra*, D080074.) As we explained at length in *Wickline I*, Wickline's status as a judgment debtor in an unrelated lawsuit was apparently the reason that Wickline's ownership interest in GOGO BVI was not formally recorded after the purchase of the resort. (*Id.*)

"The relationship between Schweder and Wickline started to deteriorate in May 2016, a few months after the January 2016 purchase of the resort. The friction between the men is documented in several e-mails

---

[3]     As of the date of the trial in 2019, after having purchased Brennan's three percent interest, Leung owned six percent of the shares of GOCO BVI, and Schweder owned 94 percent. (*Wickline I, supra*, D080074.)

6

that the trial court described in its statement of decision." (*Wickline I, supra*, D080074.)[4]

On May 17, 2017, Wickline filed a lawsuit against Schweder and other parties.[5] "The trial court decided that the two 'legal causes of action' (breach of fiduciary duty and fraudulent inducement of partnership agreement, both asserted solely against Schweder) would be tried to a jury at the same time that the two 'equitable causes of action' (declaratory relief and promissory estoppel) were tried to the court. The trial was held over the course of several weeks in February, March and April 2019." (*Wickline I, supra*, D080074.)

"Rather than being asked to return a general verdict on the two legal causes of action, the jury was asked to return a special verdict on a series of factual questions. In answering those questions, the jury found that Schweder and Wickline *did* form a partnership (of an unspecified nature), but the jury's remaining findings meant that Wickline did not prevail on either of his legal causes of action." (*Wickline I, supra*, D080074.)

"Thereafter, the parties submitted written closing arguments to the trial court on the declaratory relief and promissory estoppel causes of action. The trial court issued a . . . ruling on December 16, 2020." (*Wickline I, supra*, D080074.) "At the direction of the trial court, [Defendants] submitted a proposed statement of decision, to which Wickline filed objections, along with his own suggested revisions to [Defendants'] proposed statement of decision."

---

4       During our analysis below, we will quote the trial court's findings regarding those emails, as they are centrally relevant to the issues presented here.

5       Other than Schweder, the Defendants are Leung, GOCO BVI, Spa Venture Group Limited, GOCO Hospitality California, Inc., and Glen Ivy Hot Springs.

7

(*Id*.)  On May 4, 2021, the trial court issued a 'Ruling and Statement of Decision on Equitable Causes of Action' (Statement of Decision).  In the Statement of Decision, the trial court substantially adopted the wording used in its December 16, 2020 ruling, explaining that it did "not care for" the parties' proposals.

"In the Statement of Decision, the trial court determined it was bound by the jury's finding that Schweder and Wickline formed a partnership.  The trial court also described the history of the business relationship between Schweder and Wickline, in which it identified the nature of the partnership found by the jury . . . ."  (*Wickline I, supra*, D080074.)

"[The Statement of Decision] then set forth the following specific declaratory relief to address the items set forth in paragraph 104 of the declaratory relief cause of action in the second amended complaint:[6]

---

[6]    The cause of action for declaratory relief in the operative second amended complaint stated as follows:

"103.  [Wickline] therefore requests a full and final judicial determination of his rights and responsibilities with respect to the Glen Ivy Hot Springs resort, including each and all of Defendants GOCO Hospitality, GOCO CA, Spa Venture, and GIHS.

"104.  [Wickline] hereby requests a judicial determination and order establishing his rightful claim to the following:
  "a. [Wickline] is at least a 42.5 percent owner of GOCO Hospitality.
  "b. [Wickline] is at least a 42.5 percent owner of GOCO CA.
  "c. [Wickline] is at least a 42.5 percent owner of Spa Venture.
  "d. [Wickline] is at least a 42.5 percent owner of GIHS.
  "e. [Wickline] is entitled to at least 50 percent of the voting rights of each of the entities described in paragraphs 104 (a) through (d).
  "f. No shareholder(s) other than [Wickline] and [Schweder] is

‘1)     [Wickline] and [Schweder] entered into a partnership (pursuant to the agreement of [Wickline] and [Schweder], that the Court is bound by the Jury's finding that Plaintiff and [Schweder] formed a partnership).

‘2)     [Wickline's] and [Schweder's] oral partnership agreement provided that [Wickline] and [Schweder] would each bear their own expenses in carrying out their partnership duties.  [Wickline] and [Schweder] did not discuss or agree on the payment of salaries to themselves.  Hence, [Wickline] is not entitled to reimbursement for any expenses he may have incurred relating to his negotiation and eventual acquisition of the Glen Ivy property or back pay.

‘3)     As confirmed by [Wickline] and [Schweder], the partnership was only in GOCO Hospitality Global Opportunity Limited, a British Virgin Islands company [i.e., GOCO BVI], with each owning a 42.5% interest/shares in it and that only [Wickline's] and [Schweder's] interest/shares had voting rights.

‘4)     The Partnership between [Wickline] and [Schweder] terminated on June 16, 2016.  The Court bases this ruling on its findings that:  1) between May 16, 2016, and August 2016, [Wickline's] and [Schweder's] conduct made it not reasonably practical for [Wickline] and [Schweder] to carry on the business of the partnership together; 2) [Wickline] hid the fact that he was withholding his skills and not performing all of his duties to the partnership, thereby

_____

or are entitled to voting rights.
"g. [Wickline] is entitled to co-management of each of the entities described . . . .
"h. [Wickline] is entitled to full reimbursement of any and all expenses reasonably incurred on behalf of Defendants relating to his negotiation and eventual acquisition of the Glen Ivy property.
"i. [Wickline] is entitled to back pay in an amount to be proven at trial.
"j. [Wickline] is entitled to at least 42.5 percent of any and all profits in the Glen Ivy resort project since January 2016."

9

breaching his fiduciary duty to [Schweder]; and, [Schweder] intended to terminate the partnership on May 20, 2016. The court notes that the jury expressly found that [Schweder] did not knowingly act against [Wickline's] interest in connection with the business of the partnership. . . .

'5)      [Wickline] and [Schweder] are not partners in the Glen Ivy Hot Springs resort, Glen Ivy Hot Springs resort real property, the Glen Ivy Hot Springs resort business, GOCO California, a California corporation, or any other defendant business entity. . . .

'6)      As to paragraph 104 (j) of the declaratory relief cause of action, the term 'Glen Ivy resort project' is vague and ambiguous given the number of business entities, their alleged dealings with each other and with [Wickline] and [Schweder], and the testimony of [Wickline], [Schweder], and witnesses.  This portion of the cause of action is uncertain and inappropriate for declaratory relief.' " (*Wickline I, supra*, D080074, footnote omitted.)[7]

"The trial court's judgment, entered on July 9, 2021, repeated the Statement of Decision's six specific declaratory relief rulings that we have set forth above [(comprising Item 1 through Item 6)], along with the rejection of the promissory estoppel claim."  (*Wickline I, supra*, D080074.)

Wickline appealed from the July 9, 2021 judgment.  We resolved that appeal in *Wickline I, supra*, D080074.  In his briefing for that appeal, Wickline focused on establishing that the trial court erred when it ruled in Item 4 that "[t]he Partnership between [Wickline] and [Schweder] terminated on June 16, 2016."

---

7      The trial court also rejected Wickline's promissory estoppel cause of action, ruling that "[i]n light of the above rulings and findings by the Court, a bulk of the allegations asserted in the cause of action are unfounded." (*Wickline I, supra*, D080074.)

10

In *Wickline I*, as a preliminary step before addressing whether the trial court erred in ruling that the partnership "terminated on June 16, 2016," we had to determine what the trial court meant when it determined that the partnership "was only in" GOCO BVI. (*Wickline I, supra*, D080074.) We concluded, "Wickline and Schweder formed a partnership involving the acquisition and ownership of the Glen Ivy Hot Springs resort, which they agreed would be expressed by Wickline taking a 42.5 percent ownership interest in GOCO BVI. This was because GOCO BVI was the parent entity that owned GOCO Hospitality California, a California corporation, which in turn owned the resort." (*Wickline I, supra*, D080074.) We clarified that "the trial court did not rule that the partnership formed by Wickline and Schweder was *identical* to GOCO BVI. Instead, it ruled that the manifestation of Wickline's partnership stake would be through a 42.5 percent interest in the parent entity, GOCO BVI." (*Wickline I, supra*, D080074.) We also concluded that the partnership was governed by California law, namely, RUPA (Corp. Code, § 16100 et seq.). (*Wickline I, supra*, D080074.)

Turning to Wickline's contention that the trial court erred in ruling that the partnership "terminated on June 16, 2016," we explained that the judgment was "fatally unclear as to what the trial court might have meant by termination of the partnership." (*Wickline I*, *supra*, D080074.) Based on the trial court's statement at an earlier hearing that it " 'uses the term "terminated" because it is a term which both the plaintiff and defendant used repeatedly in the past,' " we identified and considered two possible meanings of "terminated."

First, we concluded that "[i]f the trial court intended to rule that the partnership was terminated pursuant to the requirements set forth in RUPA,

11

it erred." (*Wickline I, supra*, D080074.) We explained that under RUPA, partnership termination occurs only after dissolution and a winding up. (*Id.*, citing Corp. Code, § 16802.)[8] We stated that "without even reaching the question of whether a dissolution might have occurred, because there was no winding up, we conclude that the partnership cannot have terminated within the meaning of RUPA."[9] (*Id.*)

Second, we decided that "if the trial court meant to rule, as [Defendants] argued, that Wickline terminated the partnership by filing this lawsuit, the trial court erred." (*Wickline I, supra*, D080074.)[10]

We vacated the judgment entered on Wickline's sixth cause of action for declaratory relief, in its entirety (i.e., Items 1 through 6), and we remanded for further proceedings consistent with our opinion. (*Wickline I, supra*, D080074.) For the guidance of the trial court on remand and to forestall any further lack of clarity, we explained that if, in reevaluating the declaratory relief cause of action in light of our opinion, the trial court decided "to reissue

---

[8] We explained that although Defendants did not argue in the trial court that termination had occurred within the meaning of RUPA (Corp. Code, § 16802), Wickline argued at length in his written closing argument that the partnership could not have terminated because the requirements for partnership termination under RUPA were not present. (*Wickline I, supra*, D080074.)

[9] In addition to expressly declining to address whether dissolution occurred, we noted that "the trial court stated it was not addressing whether the partnership was dissolved." (*Wickline I,* supra, D080074.)

[10] In the trial court, Defendants had relied principally on *Gherman v. Colburn* (1977) 72 Cal.App.3d 544, 564–565, to argue that Wickline " '*terminated* the partnership as a matter of law when he elected to sue for damages, in lieu of an accounting and judicial dissolution,' and thus he was 'not entitled to a declaratory judgment based on the purported—but now unquestionably *terminated*—partnership.' " (*Wickline I, supra*, D080074.)

12

a declaratory judgment stating that the partnership has terminated, [it] must, at a minimum explain what it means by termination." (*Id.*)[11]

As previously noted, after remand Wickline filed a peremptory challenge against Judge Stamen pursuant to Code of Civil Procedure section 170.6. Wickline argued that further proceedings on the declaratory relief cause of action would amount to a "new trial" within the meaning of Code of Civil Procedure section 170.6, subdivision (a)(2). After Judge Stamen issued an order striking the peremptory challenge, Wickline filed a petition for writ of mandate, which we denied on February 22, 2024. We explained that Wickline's peremptory challenge of Judge Stamen was premature. It was not yet clear whether Judge Stamen "intend[ed] to simply clarify [the] prior declaratory judgment," in which case no peremptory challenged would be available, or, in the alternative, whether Judge Stamen intended "to reexamine it after concluding [he] previously erred," in which case proceedings constituting a "new trial" would occur. (Code Civ. Proc. § 170.6, subd. (a)(2).)

Next, on April 29, 2024, Judge Stamen issued a "Clarification of Prior Ruling" (Clarification). The initial part of the Clarification quoted (1) the portion of the May 4, 2021 Statement of Decision that ruled partnership termination occurred on June 16, 2016; (2) the specific findings from the

---

[11]    In the introduction to *Wickline I, supra*, D080074, we summarized this guidance by stating that "[i]f the trial court did intend a different meaning" of termination that was not one of the two meanings used by the parties, "it *must* provide clarification on remand." (*Id.*, italics added) As we will later discuss, the trial court appears to have focused on that language in deciding that it should provide a clarification and reissue the judgment, even if the reissued judgment did not respond to the legal errors that we noted in *Wickline I*.

13

Statement of Decision, on which Judge Stamen "based" that ruling; and (3) the portion of *Wickline I, supra*, D080074, stating that the partnership did not terminate by either method identified by the parties, and that "[i]f the trial court did intend a different meaning [of termination], it *must* provide clarification on remand." (Italics added.) The Clarification then stated the following:

> "As is made clear in the Court of Appeal's February 22, 2024 Order [denying Wickline's petition for writ of mandate], the Court can do no more than clarify its prior ruling; the [Code of Civil Procedure section] 170.6 challenge would be timely as to any substantive change.

> "At no point has it ever been suggested that a formal dissolution occurred in the sense of the first potential meaning suggested by the Court of Appeal, that the partnership had been dissolved through a dissolution followed by a winding up under Corp. Code §§ 16801 and 16802. In briefing prior to issuance of the Statement of Decision, Schweder argued that the cause of action for declaratory relief had been terminated prior to the judgment. Citing *Corrales v. Corrales* (2011) 198 Cal.App.4th 221 and *Gherman v. Colburn* (1977) 72 Cal.App.3d 544, Schweder argued that the partnership terminated when Wickline sued for damages. [Footnote omitted.]

> "In *Corrales*, the court explained that '[w]hen [a partner] [withdraws] from [a partnership], the partnership dissolved by operation of law; by definition, a partnership must consist of at least two persons. [Citation.] A person cannot dissociate from a dissolved partnership, and the buyout rule of section 16701 does not apply to a two-person partnership when one partner leaves. When that happens, the dissolution procedures take over. The partnership is wound up, its business is completed, and the partners make whatever adjustments are necessary to their own accounts after paying the creditors.' (*Corrales*, 198 Cal.App.4th 221, 227 . . . .)

> "The Court fixed the date of termination as June 16, 2016 not because Wickline had made an election of remedies by seeking tort damages as per *Gherman* (or Schweder's interpretation of *Gherman*); if nothing else, the Complaint was

14

not filed until May 2017 and the Court could not have found any such election to have occurred on or by that date. Rather, the June 16, 2016 date was the date that Wickline permanently and of his own volition withdrew himself from the partnership by 'withholding his skills and not performing all of his duties to the partnership, thereby breaching his fiduciary duty.' "

In a footnote at the end of the second paragraph quoted above, the trial court stated, "This theory was discussed by the Court of Appeal at length. Again, the purpose of this order is to clarify the Court's intent at the time the Statement of Decision was made, *not to change the Statement of Decision into a ruling that may survive on appeal.*" (Italics added.)

After issuing the Clarification, the trial court held a hearing on May 13, 2024, at which the parties expressed different views about (1) what the trial court meant in the Clarification; (2) the scope of any future proceedings; and (3) whether the trial court should approve a renewed peremptory challenge that Wickline intended to file. At the conclusion of the hearing, the trial court stated it would review the reporter's transcript from the hearing and issue a ruling to address the subjects discussed. However, ultimately, the trial court did not issue any ruling to address those subjects. Instead, on May 29, 2024, the trial court "reissued" its July 9, 2021 judgment on the declaratory relief cause of action, as "clarified" by the April 29, 2024 Clarification.

Wickline appeals from the "reissued" May 29, 2024 declaratory judgment. Schweder has filed a respondent's brief.[12]

_____

[12] In *Wickline I* we explained that because "[a]ll of the [Defendants] were sued in the declaratory relief cause of action" "they are all parties in Wickline's appeal from the declaratory judgment." (*Wickline I, supra,* D080074.) Here, however, the respondent's brief was filed by Schweder *alone* rather than by all the Defendants.

15

## DISCUSSION

A.  *Regardless of Which Party Has the Correct Interpretation of the Trial Court's Reissued Declaratory Judgment, the Ruling That the Partnership Terminated on June 16, 2016, Is Erroneous*

In this appeal, Wickline asks us to reverse the trial court's reissued judgment.  As Wickline argues, the reissued judgment is legally erroneous because it persists in stating that the partnership "terminated" on June 16, 2016, but it "fails to provide any legal basis for finding the Partnership terminated in 2016 in accordance with RUPA [(Corp. Code, § 16100 et seq.)]."  Instead, according to Wickline, the reissued judgment "invents a means of 'terminating' a partnership that RUPA does not recognize."

Schweder takes a different view of the reissued judgment.  As Schweder interprets the Clarification, the trial court has clarified that it meant to rule in the May 4, 2016 Statement of Decision that "the partnership *dissolved* by operation of law on June 16, 2016," as that term is used in RUPA (Corp. Code, § 16801) rather than that it *terminated*.  (Italics added.)  Further, according to Schweder, the ruling that the partnership *dissolved* as of that date is correct based on the law and the facts.

Therefore, as in *Wickline I*, the fundamental disagreement between Schweder and Wickline is once again over the meaning of the trial court's words.  Did the trial court intend to state in the reissued judgment, as Wickline contends, that the partnership *terminated* on June 16, 2016, and therefore no longer exists, because "Wickline permanently and of his own volition withdrew himself from the partnership by 'withholding his skills and not performing all of his duties to the partnership, thereby breaching his fiduciary duty?' "  Or, in the alternative, as Schweder contends, did the trial court mean to clarify that the partnership *dissolved* on June 16, 2016, within

16

the meaning of RUPA (Corp. Code, § 16801), when Wickline took those actions?

As we will explain, regardless of which of the two meanings the trial court intended, the reissued judgment is erroneous based on the applicable law and facts.[13]

1.    *Wickline's Interpretation*

As we have explained, Wickline interprets Item 4 of the reissued judgment to state, as did Item 4 in the original judgment, that the partnership "terminated" on June 16, 2016, under governing law and is no longer in existence. According to Wickline, the Clarification merely provided an explanation of the factual basis for that conclusion, namely, the trial court's finding that "the June 16, 2016 date was the date that Wickline permanently and of his own volition withdrew himself from the partnership by 'withholding his skills and not performing all of his duties to the partnership, thereby breaching his fiduciary duty.'" In other words, according to Wickline, the Clarification identified his breach of fiduciary duty as the basis for the termination finding.

If the trial court intended to state that the partnership terminated under governing law based on Wickline's breach of fiduciary duty, it erred. As we explained in *Wickline I*, the termination of the partnership between Wickline and Schweder is governed by RUPA (Corp. Code, § 16100 et seq.),

---

13    Wickline's fallback position in this appeal is that, at a minimum, the reissued judgment is fatally unclear. In light of the parties' conflicting interpretations of the reissued judgment, there is a sound basis for that argument. We agree that the trial court's intended meaning in the reissued judgment is difficult to interpret. However, because we are able to resolve this appeal by addressing the parties' two conflicting interpretations and concluding that the trial court erred in either case, we adopt that approach here rather than reversing on the basis of fatal lack of clarity.

which provides that a partnership does not terminate until it is dissolved and is then wound up. (*Wickline I, supra*, D080074.)

a. *Applicable Law*

"As RUPA is structured, it first sets forth the possible methods by which a partnership can be dissolved. These include, as most relevant here, (1) for a partnership at will (as opposed to a partnership for a definite term or particular undertaking), 'by the express will to dissolve and wind up the partnership business of at least half of the partners'; or (2) '[o]n application by a partner, a judicial determination that any of the following apply: [¶] (A) The economic purpose of the partnership is likely to be unreasonably frustrated. [¶] (B) Another partner has engaged in conduct relating to the partnership business that makes it not reasonably practicable to carry on the business in partnership with that partner. [¶] (C) It is not otherwise reasonably practicable to carry on the partnership business in conformity with the partnership agreement.' " (*Wickline I, supra*, D080074, quoting Corp. Code, § 16801.)

"Only *after* dissolution occurs does the possibility of a partnership *termination* arise. Specifically, RUPA states that "(a) Subject to subdivision (b), a partnership continues after dissolution only for the purpose of winding up its business. *The partnership is terminated when the winding up of its business is completed.*" (Corp. Code, § 16802, italics added.)" (*Wickline I, supra*, D080074.) Among other things, in describing the process of winding up, RUPA states:

> "(a) In winding up a partnership's business, the assets of the partnership, including the contributions of the partners required by this section, shall be applied to discharge its obligations to creditors, including, to the extent permitted by law, partners who are creditors. Any surplus shall be applied to pay in cash the net

18

amount distributable to partners in accordance with their right to distributions under subdivision (b).

"(b) Each partner is entitled to a settlement of all partnership accounts upon winding up the partnership business. In settling accounts among the partners, the profits and losses that result from the liquidation of the partnership assets shall be credited and charged to the partners' accounts. The partnership shall make a distribution to a partner in an amount equal to any excess of the credits over the charges in the partner's account. . . ." (Corp. Code, § 16807.)

Based on the governing law, if the trial court meant to rule that the partnership terminated based on Wickline's breach of fiduciary duty, that ruling has at least two problems.

b. *Wickline's Breach of Fiduciary Duty, Without More, Could Not Dissolve or Terminate a Partnership*

First, a partner's breach of fiduciary duty, without more, does not terminate a partnership, let alone dissolve it.[14] On the contrary, RUPA establishes that a breach of fiduciary duty is relevant to dissolution or termination only because it allows a partner to apply for a judicial determination of partnership dissolution if "another partner has engaged in conduct relating to the partnership business that makes it not reasonably practicable to carry on the business in partnership with that partner." (Corp. Code, § 16801, subd. (5)(B).) Schweder did not apply for a judicial dissolution based on Wickline's breach of fiduciary duty. On the contrary, he consistently maintained that no partnership ever existed. Thus, despite the trial court's finding that Wickline breached his fiduciary duty, that finding

---

14    As Wickline points out, Schweder seems to concede this point. For example, Schweder's brief in the previous appeal acknowledged that "[Wickline's] breach of fiduciary duty did not automatically dissolve" the partnership.

19

alone does not support a ruling that the partnership *dissolved*, let alone that the partnership *terminated* on June 16, 2016.[15]

### c. *The Partnership Could Not Have Terminated Without a Winding Up*

Second, a termination occurs only upon a winding up. (Corp. Code, § 16802, subd (a) ["The partnership is terminated when the winding up of its business is completed."].) We explained in *Wickline I*, "It is undisputed that there was never any attempt to undertake a winding up of the partnership between Wickline and Schweder. Indeed, Schweder has consistently denied that any partnership existed, or that Wickline was ever entitled to any interest in GOCO BVI. Schweder, accordingly, has not attempted to participate in a winding up. Thus, without even reaching the question of whether a dissolution might have occurred, because there was no winding up, we conclude that the partnership cannot have terminated within the meaning of RUPA." (*Wickline I, supra*, D080074, footnote omitted.) As was the case with the judgment we reviewed in *Wickline I*, the reissued judgment references no finding that a winding up process occurred. Accordingly, assuming (as Wickline asserts) that the reissued judgment intended to rule that the partnership terminated under applicable law on June 16, 2016, that reissued judgment is legally erroneous because the trial court did not find that there has been a winding up of the partnership.[16]

---

[15] In section II.B, *post*, we discuss and reject Schweder's argument, made for the first time in this appeal, that certain statements he made in 2020 and 2021 during the course of this litigation should be viewed as an application for judicial *dissolution* within the meaning of RUPA.

[16] Although he did not make the contention in his briefing of the previous appeal, Schweder now argues that the absence of a winding up procedure does not preclude a termination of the partnership because, according to him,

In sum, we agree with Wickline that, if the reissued judgment intended to state that the partnership terminated on June 16, 2016, based on a finding that Wickline breached a fiduciary duty on that date, the trial court erred in issuing that judgment because, under applicable law, partnership termination could not have occurred on June 16, 2016.

2.    *Schweder's Interpretation*

In Schweder's view, Item 4 of the reissued judgment rules that the partnership *dissolved* on June 16, 2016 within the meaning of RUPA (Corp. Code, § 16801) due to Wickline's actions as of that date. Schweder bases this interpretation primarily on the Clarification's inclusion of a quotation from *Corrales v. Corrales* (2011) 198 Cal.App.4th 221 (*Corrales*).

*Corrales* involved a two-person partnership. (*Corrales, supra*, 198 Cal.App.4th at p. 224.) One of the partners expressly elected to dissociate from the partnership by sending his other partner a " 'Notice of Dissociation,' . . . , in which he stated that he was withdrawing from the partnership." (*Id.* at p. 225.) By sending a notice of dissociation, the partner

---

"the trial evidence shows . . . that there was nothing . . . for the partnership to wind up." Because Schweder could have raised that argument previously, but did not, he has forfeited it and may not use this appeal to relitigate our opinion in *Wickline I*. (See, e.g., *Global Protein Products, Inc. v. Le* (2019) 42 Cal.App.5th 352, 369 (*Global Protein*) ["to the extent appellants challenge issues that could have been raised in a prior appeal . . . those issues are not now reviewable here"].) Further, because the Statement of Decision did not address whether the partnership had any business, assets, property or obligations to wind up, Schweder's argument relies on an implied finding on that issue. As we discuss at more length, *post*, Wickline requested a statement of decision and then filed objections to it. As a result, Schweder may not rely on implied findings to support the judgment. (See *In re Marriage of Arceneaux* (1990) 51 Cal.3d 1130, 1134; Code Civ. Proc., § 634.) As specifically relevant here, Wickline objected that the statement of decision should "note that there has been no winding [up] of the partnership."

was invoking the provision of RUPA which states, "A partner is dissociated from a partnership upon the occurrence of any of the following events: (1) The partnership's having notice of the partner's express will to withdraw as a partner or on a later date specified by the partner." (Corp. Code, § 16601, subd. (a).)

During the trial in *Corrales*, "[a] major issue in the case was the valuation of the business *for buyout purposes*, pursuant to Corporations Code section 16701." (*Corrales, supra*, 198 Cal.App.4th at p. 225, italics added.) Corporations Code section 16701 provides that, with certain exceptions, "(a) If a partner is dissociated from a partnership, the partnership shall cause the dissociated partner's interest in the partnership to be purchased for a buyout price determined pursuant to subdivision (b)." (Corp. Code, § 16701.) *Corrales* concluded that the buyout provision did not apply because a two-person partnership dissolved upon dissociation by one partner, and there was, accordingly, no remaining partnership that could buy out the departing partner's interest. In the Clarification, the trial court quoted the following holding from *Corrales,* replacing the names of the parties and their partnership with generic bracketed references: "In *Corrales*, the court explained '[w]hen [a partner] [withdraws] from [a partnership], the partnership dissolve[s] by operation of law; by definition, a partnership must consist of at least two persons. [Citation.] A person cannot dissociate from a dissolved partnership, and the buyout rule of section 16701 does not apply to a two-person partnership when one partner leaves. When that happens, the dissolution procedures take over. The partnership is wound up, its business is completed, and the partners make whatever adjustments are necessary to their own accounts after paying the creditors.' (*Corrales*, 198 Cal.App.4th 221, 227 [footnotes omitted].)"

Schweder concludes that by quoting from *Corrales* in the Clarification and stating the partnership "terminated" on June 16, 2016, the trial court intended to rule that, as of that date, Wickline's actions constituted a *dissociation* from the partnership. Further, according to Schweder, because, as in *Corrales*, *supra*, 198 Cal. App.4th 221, the partnership between him and Wickline was a two-person partnership, the partnership *dissolved* as a result of that dissociation.[17]

17    In the course of his appellate briefing, Wickline contends that the partnership at issue is not a *two-person* partnership, but rather a *four-person* partnership, which also includes Brennan and Leung. Wickline bases this assertion on the trial court's finding that Wickline and Schweder confirmed in a December 2015 string of e-mails that "after the sale of the Resort:  42.5 percent of the shares of [GOCO BVI] would be transferred to [Wickline], 42.5 percent of the shares would be transferred to [Schweder;] and, the remaining shares reserved for later transfer to the company's key representatives and managers." Wickline also refers to a diagram that Brennan drew in July 2016 for the resort's accountants to illustrate the resort's ownership structure. That diagram appears to show Schweder, Wickline, Leung and Brennan as shareholders in GOCO BVI. We reject Wickline's contention that a four-person partnership was formed. Wickline confuses the partnership with the corporate entity GOCO BVI. As we explained in *Wickline I, supra*, D080074, "Wickline and Schweder formed a partnership involving the acquisition and ownership of the Glen Ivy Hot Springs resort, which they agreed would be expressed by Wickline taking a 42.5 percent ownership interest in GOCO BVI," but that partnership has "a legal existence that is *distinct* from the British Virgin Islands company that ultimately owns the Glen Ivy Hot Springs resort." Therefore, as we established in *Wickline I*, the partnership between Wickline and Schweder was a two-person partnership. The number of shareholders in the *distinct* entity GOCO BVI has no bearing on that issue.

23

However, if this is what the trial court intended, such a ruling is not supported by the trial court's findings of fact, or by the evidence on which those findings are based.[18]

Under Schweder's interpretation of the Clarification, the purported dissociation occurred on June 16, 2016, because, as the trial court stated, that "was the date that Wickline permanently and of his own volition withdrew himself from the partnership by 'withholding his skills and not performing all of his duties to the partnership, thereby breaching his fiduciary duty.'" The trial court's specific findings related to Wickline's actions on June 16, 2016, are described in the following portion of the Statement of Decision.

> "In May 2016, [Wickline] requested reimbursement for expenses. That resulted in an exchange of e-mail between [Wickline] and [Schweder]. In an e-mail of May 20, 2016, by [Schweder] to [Wickline], [Schweder] stated: 'We Will honor everything we agreed upon ! but I prefer to not have a partner who seeks a different way of doing things and who does not seem to be content with gocos more frugal approach to matters. Money is by no means all what counts for me and your aggression and words( not only in your mail ) unacceptable to me. GOCO will refrain from participating in Vegas and Santa Fe. Pls don't send related mails to my GOCO mail as my secy reads them . . . , And the staff talks. Also pls refrain from voicing your issues to my team as done in the past and today.' [Citation to trial exhibit.]

> "An e-mail of May 23, 2016, from [Schweder] to [Wickline], concerned whether [Wickline] and [Schweder] had agreed to bear

---

[18]  Wickline contends that because Schweder did not argue in the previous appeal that the partnership dissolved when Wickline disassociated from it, he has forfeited his ability to raise the issue in this appeal. (See, e.g., *Global Protein, supra*, 42 Cal.App.5th at p. 369.) We reject that contention because Schweder's argument on that issue in this appeal is based on the trial court's issuance of the Clarification, including its reference to *Corrales*, 198 Cal.App.4th 221, which occurred *after* the previous appeal.

their own expenses in connection with their partnership and concerned [Wickline's] leadership skills, propensity to act and make decisions unilaterally and outside of the business structure, rather than as part of a team and within the business structure. [Citation to trial exhibit.] The exchange included the statement by [Schweder] that, '[y]ou constantly complain about not earning enough money and feel that your 42.5% is not sufficient.' [Citation to trial exhibit.]

"On June 16, 2016, [Wickline] sent an e-mail to himself wherein he memorialized that he: intended to sue [Schweder]; needed to work with an attorney to insure evidence he gathered would be admissible at trial so [Schweder] 'hangs himself'; perform just enough to make the status of his involvement in partnership/Resort unclear; and, withhold his most valuable skills and not perform some of his duties. [Citation to trial exhibit.] In August 2016, [Schweder's] counsel sent a partnership termination letter to [Wickline's] counsel ('supplementing' the e-mail [Schweder] sent to [Wickline] on May 20, 2016).' " (*Wickline I, supra*, D080074, footnotes omitted.)[19]

Based on these findings, along with the Clarification, we understand the trial court to have relied on Wickline's June 16, 2016 email for its conclusion that the partnership terminated on that date. Therefore, we examine that email more closely to determine whether, as Schweder contends, the trial court properly concluded that the partnership *dissolved* on June 16, 2016, under governing law.

a.   *Wickline's Email on June 16, 2016 Could Not Have Resulted in a Dissociation From the Partnership*

The email that Wickline sent to himself on June 16, 2016, stated in full, "Affirm shareholder terms and Operating Agreement[.] Decisions mutual

---

19   As we explained in *Wickline I*, we "corrected the typos in the trial court's statement of decision to match the text of the original e-mails from which the trial court quoted (which themselves contain several typos)." (*Wickline I, supra*, D080074.)

25

and all capital improvements approved by me. His embezzlement has forfeited his rights of control. Must be repaid[.] [¶] Need attorney to advise on evidentiary steps so he hangs himself. Don't show my hand until plan in place[.] [¶] Show my engagement. But leave my invaluable tasks hanging in balance[.] [¶] Detrimental reliance on assurances. Written, verbal, and my actions show my reliance." It is undisputed that Wickline did not send this email to anyone but himself. Thus, at most, the email can be understood to support a finding, which the trial court made, that as of June 16, 2016, Wickline had decided to eventually sue Schweder, and that by resolving to "withhold his most valuable skills and not perform some of his duties," Wickline planned to breach his fiduciary duty to the partnership.

As stated in the applicable provision in RUPA, "A partner is dissociated from a partnership upon . . . : (1) The partnership's having notice of the partner's express will to withdraw as a partner or on a later date specified by the partner." (Corp. Code, § 16601, subd. (a).) Wickline's act of sending himself the email on June 16, 2016, does not meet the relevant statutory requirement for dissociation. For one thing, no one but Wickline received the email. RUPA provides, "A person has notice of a fact if any of the following apply: [¶] (1) The person knows of it. [¶] (2) The person has received a notification of it. [¶] (3) The person has reason to know it exists from all of the facts known to the person at the time in question." (Corp. Code, § 16102, subd. (b).) Further, notice to one of the partners in a partnership constitutes notice to the partnership as a whole. (*Id.*, subd. (f) ["A partner's knowledge, notice, or receipt of a notification of a fact relating to the partnership is effective immediately as knowledge by, notice to, or receipt of a notification by the partnership."].) Here, as the partnership consisted of only Wickline and Schweder, to give notice to the partnership, Wickline would have had to

26

give notice to Schweder. However, Schweder did not receive Wickline's email, and there is no evidence Schweder learned of its content in any other manner. Thus, the partnership did not have notice of what Wickline wrote in the email.

Moreover, even if Schweder were somehow to have learned of what was contained in Wickline's email, that content would not have communicated Wickline's "express will to withdraw as a partner." (Corp. Code, § 16601, subd. (a).) In fact, the email says the opposite. Although, as we have noted, the email supports a finding that Wickline planned to breach his fiduciary duty to the partnership, the email also indicates that Wickline intended to remain in the partnership and assert his ongoing legal rights as a partner. Specifically, the email states that Wickline intends to "[a]ffirm shareholder terms and Operating Agreement," wants to ensure that "[d]ecisions [are] mutual and all capital improvements approved by me," plans to "[s]how my engagement," and aims to prove that Schweder "forfeited his rights of control." These statements all indicate that Wickline intended to reaffirm the terms of the partnership, and that he wanted to assert his right to participate in the partnership and make decisions, while also trying to wrest control away from Schweder. No reasonable person reading the email would interpret it to mean that Wickline was willfully and expressly withdrawing from the partnership.

b. *Schweder's Argument for an Implied Finding Is Unavailing*

Acknowledging that he did not have notice of Wickline's June 16, 2016 email, Schweder contends that we should nevertheless imply a finding, supported by substantial evidence, that Schweder received notice, around June 16, 2016, by means *other* than Wickline's email, that Wickline was dissociating from the partnership. In arguing that we should imply such a finding, Schweder points to evidence that "Wickline had refused to respond to

27

any of the several emails that Schweder sent him expressing significant doubts about the viability of their business relationship" and "ignored Schweder's call and messages for months after these emails, leading Schweder to believe that Wickline had resigned from his company." Schweder also points to evidence that he "learned that Wickline was planning to sue him."

Wickline responds with two points. As we will explain, both have merit.

First, Wickline argues that because he objected to the proposed statement of decision's findings regarding termination or dissolution of the partnership, Schweder may not rely on the doctrine of implied findings. (Code Civ. Proc., § 634.) We agree. To avoid implied findings, "[t]he statutes . . . describe a two-step process: first, a party must request a statement of decision as to specific issues to obtain an explanation of the trial court's tentative decision ([Code Civ. Proc.,] § 632); second, if the court issues such a statement, a party claiming deficiencies therein must bring such defects to the trial court's attention to avoid implied findings on appeal favorable to the judgment ([Code Civ. Proc.,] § 634)." (*Arceneaux, supra*, 51 Cal.3d at p. 1134.) Wickline complied with those requirements, as he requested a statement of decision as to "how [the] partnership dissolved or terminated", and he then objected, in detail, to the proposed statement of decision that the trial court directed Schweder to prepare.[20] Thus, we will not imply findings.

---

[20]   Schweder contends that Wickline's objections to the proposed statement of decision were ineffectual to avoid implied findings because the trial court ended up issuing a statement of decision *different* from what Schweder proposed. The argument fails. After Wickline requested a

Second, Wickline argues that *even if* we were to imply findings that are omitted from the Statement of Decision, substantial evidence does not support an implied finding that Wickline behaved in such a manner around June 16, 2016, so as to give Schweder notice of his express will to withdraw from the partnership. (See *Fladeboe v. American Isuzu Motors Inc.* (2007) 150 Cal.App.4th 42, 60 ["The appellate court . . . reviews the implied factual findings under the substantial evidence standard."].)

As we have explained, dissociation only occurs upon notice of a partner's "express will" to withdraw from the partnership. We have not located or been referred to any case law defining the phrase "express will" as it is used in RUPA (Corp. Code, § 16601, subd. (a)), but dictionaries define the adjective "express" to mean "directly, firmly, and explicitly stated" (Merriam-Webster's Online Dictionary (2025) <https://perma.cc/A7XS-BFDW> [as of December 10, 2025) and "clearly and unmistakably communicated; stated with directness and clarity." (Black's Law Dict. (12th ed. 2024) p. 724.)

In support of his contention that Wickline communicated an express will to withdraw from the partnership Schweder points to his trial testimony that Wickline did not reply to his emails and text messages for three months

statement of decision, the trial court directed Schweder to prepare it pursuant to California Rules of Court, rule 3.1590(f), and Schweder did so. Pursuant to rule 3.1590(f), Wickline then filed objections to that proposed statement of decision, including with respect to findings regarding termination and dissolution of the partnership. After considering Wickline's objections, as well as Schweder's response to those objections, the trial court decided to issue a final statement of decision that was substantially different from Schweder's proposal. However, Wickline's filing of the objections to Schweder's proposal was his only opportunity to object to the proposed statement of decision, as required by Code of Civil Procedure section 634, to avoid implied findings.

prior to August 2016, and that he learned from unspecified third parties sometime before August 2016 that Wickline "had communicated . . . that he wanted to sue [Schweder]." Schweder testified that, based on those facts, he was "under the impression" that Wickline "had no desire to be in touch with us anymore."[21] The evidence that Schweder cites is not sufficient to support the finding that Schweder asks us to imply. Certainly, the evidence shows that a serious dispute was developing between Schweder and Wickline between May and August 2016. But none of the evidence cited by Schweder consists of direct, firmly stated, clear and unmistakable communication from Wickline to Schweder that he intended to withdraw from the partnership.

We therefore conclude that, even assuming (as Schweder contends) that the reissued judgment rules that Wickline *dissociated* from the partnership on June 16, 2016, and thereby *dissolved* it, the trial court erred in making that ruling.

B. *The Declaratory Judgment May Not Be Affirmed on the Alternative Grounds Identified by Schweder*

Schweder argues that we should affirm the declaratory judgment on partnership termination in Item 4, after recharacterizing it as a declaratory judgment on partnership *dissolution,* based on three "alternative" grounds that the trial court did not identify in the reissued judgment.

First, Schweder argues that we should affirm Item 4 of the declaratory judgment by concluding that *Schweder* (rather than Wickline) dissociated from the partnership on August 18, 2016, when Schweder's counsel sent an

---

21    We note that Wickline disputes Schweder's claim that Wickline cut off communication for three months between May and August 2016. Wickline cites an email he sent Schweder on May 30, 2016, emails that he exchanged with Brennan throughout June 2016, an email he sent to Schweder on July 12, 2016, and a meeting with accountants that he attended in July 2016.

email to Wickline's counsel, which Schweder also forwarded to Wickline. The email stated, "As you know, my clients wish to sever their relationship with Mr. Wickline. You and I previously discussed the option of an early mediation to resolve issues relating to Mr. Wickline's involvement with Glen Ivy. Although you indicated in our initial call, that Mr. Wickline might be amenable to this approach, I am still waiting for a response. In the meantime, we have asked that Mr. Wickline cease all activities in connection with Goco Hospitality and Glen Ivy. As you can see from the emails below, Mr. Wickline is insisting on attending a [General Plan Advisory Committee] hearing on Glen Ivy entitlements. Mr. Wickline is not a Goco shareholder and is not authorized to speak or act on Goco's behalf. Please instruct Mr. Wickline not to attend the hearing and certainly not to make any statements or representations on Goco's behalf." According to Schweder, as of that date, "there can be no doubt that Wickline actually knew or had reason to know—'from all the facts known to the person at the time in question' ([Corp. Code,] § 16102, subd. (b)(3)—of Schweder's express will to withdraw from the Wickline-Schweder partnership by August 2016."[22]

Second, Schweder contends that we should affirm Item 4 of the declaratory judgment by concluding that the partnership "dissolved because Schweder applied for, and the trial court issued, a judicial dissolution." For this argument, Schweder relies on the provision in RUPA stating that a partnership may be dissolved "[o]n application by a partner, [by] a judicial determination that any of the following apply: [¶] . . . [¶] (B) Another partner has engaged in conduct relating to the partnership business that makes it not

_____

[22] Schweder testified that the August 18, 2016 email was meant to sever Wickline's "employment relationship," not to dissolve a partnership.

31

reasonably practicable to carry on the business in partnership with that partner. [¶] (C) It is not otherwise reasonably practicable to carry on the partnership business in conformity with the partnership agreement." (Corp. Code, § 16801, subd. (5).) Schweder contends that he engaged in the "equivalent" of applying to the court to dissolve the partnership because of statements he made during this litigation in 2020 and 2021. Specifically, in his August 17, 2020 closing trial brief on Wickline's equitable cause of action, Schweder argued that "*[i]f* there had been a Glen Ivy partnership, [Wickline's] June 2016 plot would have been a repudiation and termination of the partnership and a breach of fiduciary duty to Schweder." (Italics added.) Next, after the trial court issued its December 16, 2020 ruling on the equitable causes of action, Schweder submitted a proposed statement of decision on February 4, 2021, that proposed to include the trial court's ruling that "between May 16, 2016, and August 2016, [Wickline's] and [Schweder's] conduct made it not reasonably practical, for [Wickline] and [Schweder] to carry on the business of the partnership together" and that Wickline had breached his fiduciary duty. According to Schweder, we may rely on those statements to conclude that he applied to the court for a dissolution of the partnership on grounds permitted by RUPA (Corp. Code, § 16801, subd. (5)), which the trial court approved by issuing the declaratory judgment.

Third, Schweder asks us to affirm on the alternative ground that the partnership was formed for the particular undertaking of purchasing the resort and then "necessarily dissolved when it completed its undertaking." Specifically, Schweder relies on the provision in RUPA providing that "a partnership for a definite term or particular undertaking" dissolves upon "[t]he expiration of the term or the completion of the undertaking." (Corp. Code, § 16801.) According to Schweder, the partnership "completed its one

32

achievable undertaking—GOCO California's acquisition of the Resort—in January 2016, and thereupon dissolved as a matter of law."[23]

We reject each of the alternative grounds that Schweder has identified for two reasons.

For one thing, even assuming, as Schweder does, that the trial court meant to refer in Item 4 to partnership *dissolution,* rather than a *termination*, on June 16, 2016, none of the alternative grounds Schweder advances would result in a dissolution on June 16, 2016. Instead, if meritorious, those grounds would result in a dissolution on either (1) August 18, 2016, when Schweder's counsel sent the email to Wickline's attorney; (2) July 9, 2021, when the trial court issued its judgment; or (3) in January 2016 when the resort was acquired. Thus, the purported "alternative grounds" for affirming the judgment advanced by Schweder are, in fact, arguments *against* affirming the trial court's ruling that the partnership terminated on June 16, 2016, because they would result in a dissolution on a completely different date.

Just as significantly however, Schweder has forfeited his ability to advance the three new theories he asserts as "alterative grounds" for affirming the judgment because they are inconsistent with the position he took in the trial court. " 'The rule is well settled that the theory upon which a case is tried must be adhered to on appeal. A party is not permitted to change his position and adopt a new and different theory on appeal. To

---

[23]    Wickline disputes Schweder's assertion that the partnership was formed for the limited purpose of *acquiring* the resort, rather than for the *ongoing* purpose of acquiring and then *owning* it. Among other things, Wickline points to our holding in *Wickline I, supra*, D080074, that "Wickline and Schweder formed a partnership involving the acquisition *and ownership* of the Glen Ivy Hot Springs resort." (Italics added.)

33

permit him to do so would not only be unfair to the trial court, but manifestly unjust to the opposing litigant.' " (*Cable Connection, Inc. v. DIRECTV, Inc.* (2008) 44 Cal.4th 1334, 1350, fn. 12; see also *Bermudez v. Ciolek* (2015) 237 Cal.App.4th 1311, 1323 [defendant barred from asserting new theory on appeal after trial].)

Schweder's theory in the trial court, as explained in his closing brief on the equitable causes of action, was that "[Wickline] had no partnership interest in Glen Ivy," but that even if he did, "[Wickline] terminated any partnership or ownership that may have existed when he elected to sue for damages . . . ." Those theories are inconsistent with each of the three alternative grounds that Schweder advances here. The first alternative ground assumes that Schweder recognized a partnership but chose to dissolve it. The second alternative ground assumes that Schweder recognized a partnership but asked the trial court to dissolve it. The third alternative ground assumes that Schweder recognized a partnership, but only for the limited purpose of acquiring the resort. Because each of the alternative grounds conflicts with Schweder's litigating position that (1) no partnership existed, and (2) any partnership dissolved when Wickline filed a suit seeking damages, Schweder may not rely on any three of the alternative grounds in this appeal.

D.    *Appellate Disposition and the Scope of Proceedings on Remand*

Based on the above discussion, we conclude that the trial court erred in the reissued declaratory judgment when it incorporated Item 4 from the July 9, 2021 declaratory judgment. Item 4 states that "[t]he Partnership between [Wickline] and [Schweder] terminated on June 16, 2016," and it proceeds to set forth the trial court's reasoning for that determination.

34

Having concluded the trial court erred in issuing Item 4 in the reissued declaratory judgment, we hereby vacate Item 4.

In vacating Item 4 in the reissued declaratory judgment, we perceive no basis for vacating Item 3 in that judgment. Item 3 states: "As confirmed by [Wickline] and [Schweder], the partnership was only in GOCO Hospitality Global Opportunity Limited, a British Virgin Islands company [i.e., GOCO BVI], with each owning a 42.5% interest/shares in it and that only [Wickline's] and [Schweder's] interest/shares had voting rights." As we determined in *Wickline I*, that part of the judgment establishes that "Wickline and Schweder formed a partnership involving the acquisition and ownership of the Glen Ivy Hot Springs resort, which they agreed would be expressed by Wickline taking a 42.5 percent ownership interest in GOCO BVI." (*Wickline I, supra*, D080074.)[24] The trial court's definition of Wickline's and Schweder's partnership, as reflected in Item 3 of the declaratory judgment, along with our subsequent discussion in *Wickline I, supra*, D080074, regarding the terms of that partnership, are not impacted by our conclusion that the trial court erred in its ruling in Item 4 of the declaratory judgment regarding partnership termination. Similarly, Items 1, 2 and 6 in the reissued declaratory judgment, which have not been a focus of the parties' recent litigation, are also logically unrelated to the trial court's ruling on partnership termination in Item 4. We accordingly do not vacate Items 1, 2, 3 and 6 in the reissued declaratory judgment.

However, based on our review of the relevant language, the trial court's ruling on Item 5 in the reissued declaratory judgment may have been dependent on the trial court's ruling on partnership termination in Item 4.

---

24    As we clarified above, the partnership involved only two members: Schweder and Wickline. (See fn. 17, *ante*.)

Item 5 states: "[Wickline] and [Schweder] are not partners in the Glen Ivy Hot Springs resort, Glen Ivy Hot Springs resort real property, the Glen Ivy Hot Springs resort business, GOCO California, a California corporation, or any other defendant business entity. [Wickline] is not entitled to co-management of those businesses, properties, and entities." Item 5 is phrased in the present tense as it states that Wickline and Schweder "are not partners" and Wickline "is not entitled" to co-management. It is possible, therefore, that the trial court based its ruling in Item 5 on its conclusion in Item 4 that the partnership terminated on June 16, 2016. Accordingly, along with vacating Item 4 in the reissued declaratory judgment we also vacate Item 5 in the reissued declaratory judgment so that proceedings on remand are not impacted by the trial court's erroneous ruling in Item 4.

In the declaratory relief cause of action Wickline sought "a full and final judicial determination of his rights and responsibilities with respect to the Glen Ivy Hot Springs resort." Because we are vacating Item 4 and Item 5 in the reissued declaratory judgment, Wickline has not yet obtained the determination that he sought in the declaratory relief cause of action as to his rights and responsibilities. On remand, Wickline is entitled to a judicial declaration on the current status of the partnership we described in *Wickline I, supra*, D080074, along with a declaration on his rights and responsibilities as a result of that partnership.

## DISPOSITION

We vacate Item 4 and Item 5 in the July 9, 2021 declaratory judgment, as reissued May 29, 2024, and we remand to the trial court. On remand, the trial court is directed to provide Wickline with a judicial determination regarding the partnership that we described in *Wickline I, supra*, D080074, including (1) the current status of that partnership, and (2) the parties' rights

36

and responsibilities arising from that partnership.  The parties shall bear their own costs on appeal.

IRION, Acting P. J.

WE CONCUR:

CASTILLO, J.

RUBIN, J.